IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLORIA La RIVA;                          :
CLAIRE COOK;                             :
NICOLE ROUSSELL;                         :
SEAN BLACKMON,                           :
                                         :
            Plaintiffs,                  :
                                         :          Civil Action No.: 1:20-cv-1937-RDM
v.                                       :
                                         :
DISTRICT OF COLUMBIA                     :
BOARD OF ELECTIONS,                      :
                                         :
            Defendant.                   :

**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED
MEMORANDUM OF LAW</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The COVID-19 Pandemic Has Had Devastating Consequences . . . . . . . . . . . . . . . . . . . . . . . . . 3

The Mayor and City Council in D.C. Have Recognized COVID-19's Impact . . . . . . . . . . . . . . . 4

Courts Around the Country Have Modified Ballot Access Requirements Due to
 the Severe Burden Caused by the COVID-19 Pandemic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Political Leaders in Other States Also Have Recognized the Impact on Ballot Access . . . . . . . . 7

Election Law Experts Have Criticized Inaction on Ballot Access During the Pandemic. . . . . . . 7

ANALYTIC FRAMEWORK IN BALLOT ACCESS CASES . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      First and Fourteenth Amendment Ballot Access Analysis . . . . . . . . . . . . . . . . . . . . . . . . 9
      Candidates' and Voters' Rights are at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      The Burden Here is Severe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      *Anderson-Burdick* Applied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Legal Framework for the Consideration of a Preliminary Injunction Motion . . . . . . . . . . . . . . 14

      Plaintiffs Satisfy All Requirements for the Requested Preliminary Injunction . . . . . . . . 15

            A.  Plaintiffs are Likely to Succeed on the Merits . . . . . . . . . . . . . . . . . . . . . . . . 15
            B.  Plaintiffs Will Suffer Irreparable Harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            C.  A Balancing of the Equities Favors the Plaintiffs . . . . . . . . . . . . . . . . . . . . . . 21
            D.  The Injunction is in the Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION AND REQUESTED REMEDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# **TABLE OF AUTHORITIES**

**Page(s):**

**Cases:**

*\*Acosta v. Restrepo*,
    2020 WL 3495777 (D. R.I., June 25, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Alexander v. Gov't of the Dist. of Columbia*,
    2020 U.S. Dist. 115856 (D.D.C., July 1, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Am. Party of Texas v. White*,
    415 U.S. 767 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*\*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Bergland v. Harris*,
    767 F.2d 1551 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bolling v. Sharpe*,
    347 U.S. 497 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*\*Burdick v. Takashi*,
    504 U.S. 428 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14

*California Democratic Party v. Jones*,
    530 U.S. 567 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*\*Clingman v. Beaver*,
    544 U.S. 581 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*\*Constitution Party of Virginia v. Virginia State Board of Elections*,
    2020 U.S. Dist. LEXIS 125589 (E.D. Va., July 15, 2020) . . . . . . . . . . . . . . . . . . . . . . . . 7

*Costa v. Bazron*,
    2020 U.S. Dist. LEXIS 91043 (D. D.C., May 24, 2020) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cowen v. Ga. Sec'y of State*,
    2020 U.S. App. LEXIS 17427 (11th Cir., June 3, 2020) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Daien v. Ysura,
　　711 F. Supp. 2d 1215 (D. Idaho 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Delaney v. Bartlett,
　　370 F. Supp. 2d 373 (M.D. N.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Dixon v. District of Columbia,
　　666 F.3d 1337 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Esskahi v. Whitmer,
　　2020 WL 2185553; 2020 U.S. App. LEXIS 14376 (6th Cir., May 5, 2020) . . . . . . . 19, 23

*Esshaki v. Whitmer,
　　2020 WL 1910154 (E.D. Mich., April 20, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 19

*Esskahi v. Whitmer,
　　2020 U.S. Dist. LEXIS 88536 (E.D. Mich, May 20, 2020) . . . . . . . . . . . . . . . . . . . . . . . 19

Eu v. San Francisco County Democratic Central Committee
　　489 U.S. 214 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Fair Maps Nevada v. Cegavske,
　　2020 WL 2798018 (D. Nev., May 29, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Garbett v. Herbert,
　　2020 WL 2064101 (D. Utah, May 1, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Gottlieb v. Lamont,
　　2020 WL 3046205 (D. Conn., June 8, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Green Party v. Aichele,
　　2015 WL 871150 (E.D. Pa., March 2, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Green Party of Georgia v. Georgia,
　　551 Fed. Appx. 982 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Green Party of Tennessee v. Hargett,
　　791 F.3d 684 (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Hobby Lobby Stores, Inc. v. Sebelius,
　　723 F.3d 1114 (10th Cir. 2013)(en banc), aff'd 134 S. C. 2751 (2014) . . . . . . . . . . . . . 21

*Illinois State Board of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20

*Johnson v. Cook County Officers Electoral Bd.*,
    680 F. Supp. 1229 (N.D. Ill. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jones v. McGuffage*,
    921 F. Supp. 2d 888 (N.D. Ill. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lawrence v. Blackwell*,
    430 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Libertarian Party v. D.C. Board of Elections & Ethics*,
    682 F.3d 72 (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*\*Libertarian Party of Illinois v. Cardigan*,
    2020 WL 3421662 (7th Cir., June 21, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Libertarian Party of Illinois v. Scholz*,
    872 F.3d 518 (7th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Libertarian Party of Virginia v. Judd*,
    881 F. Supp. 2d 719 (E.D. Va. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lux v. Judd*,
    651 F.3d 396 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

*Lux v Judd*,
    842 F. Supp. 2d 895 (E.D. Va. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Marion County Committee of Indiana Democratic Party v. Marion Co. Election Bd.*,
    2000 WL 1206740 (S.D. Ind., August 2, 2000) (unpublished). . . . . . . . . . . . . . . . . . . . . 21

*Miller v. Thurston*,
    2020 WL 2617312 (W.D. Ark., May 25, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Munro v. Socialist Workers Party*,
    479 U.S. 189 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Nader v. Keith*,
    385 F.3d 729 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Norman v. Reed*,
  502 U.S. 279 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*\*People Not Politicians v. Clarno*,
  2020 WL 3960440 (D. Oregon, July 13, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Pilcher v. Rains*,
  853 F.2d 334 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*\*Reclaim Idaho v. Little*,
  2020 WL 3490216 (D. Idaho, June 26, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Swanson v. Bennett*,
  219 F. Supp. 1225 (M.D. Ala. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Swanson v. Worley*,
  490 F.3d 894 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tashjian v. Republican Party of Conn.*,
  479 U.S. 208 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States v. Harris*
  2020 U.S. Dist. LEXIS 53632 (D.D.C., March 27, 2020) . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Thomas*,
  2020 U.S. Dist. LEXIS 68768 (D.D.C., April 20, 2020) . . . . . . . . . . . . . . . . . . . . . . 3

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*\*Westberry v. Sanders*,
  376 U.S. 1 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Williams v. Rhodes*,
  393 U.S. 23 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

v

*Wise v. Lipscomb*,
    437 U.S. 535 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statutes and Other Legislative Materials:**

*D.C. Official Code § 1-1001.08 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 22

*D.C. Official Code § 1-123(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

https://www.dcboe.org/dcboe/media/PDFFiles/Candidate-Guide-to-Ballot-Access-2020-Rev-6_2
020.pdf  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

https://dccouncil.us/wp-content/uploads/2020/05/Coronavirus-Support-Act-DEC.pdf  . . . . . . . . 5

https://dccouncil.us/wp-content/uploads/2020/04/Coronavirus20Omnibus20Emergency20DEC.p
df  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

https://dccouncil.us/council-unanimously-passes-fourth-covid-response-measure/  . . . . . . . . . . 5

https://dccouncil.us/wp-content/uploads/2020/04/DRAFT20Ballot20Access20Reform20Tempora
ry20Amendment20Act20of202020.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

https://code.dccouncil.us/dc/council/acts/23-317.html  . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

https://code.dccouncil.us/dc/council/acts/23-317.html;
*67 D.C. Reg. 5235 (May 13, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

https://dcboe.org/dcboe/media/PDFFiles/Updated-110320-GE-Election-Calendar-051220.pdf  16

**Articles:**

https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html . . . . . . . . . . . 4

https://coronavirus.dc.gov/page/coronavirus-data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

https://abcnews.go.com/Politics/coronavirus-upends-elections-ballot-access-point-concern/story?
id=70288113  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

https://www.spokesman.com/stories/2020/may/06/candidates-who-are-broke-will-get-a-break-wh
en-fil/  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

https://nj.gov/governor/news/news/562020/approved/20200429a.shtml  . . . . . . . . . . . . . . . . . 7

https://lawreviewblog.uchicago.edu/2020/06/26/pandemic-initiative-hasen/ . . . . . . . . . . . . . . . 7

**Rules:**

Rule 65(a), Federal Rules of Civil Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GLORIA La RIVA; | : | |
| CLAIRE COOK; | : | |
| NICOLE ROUSSELL; | : | |
| SEAN BLACKMON, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No.: 1:20-cv-1937-RDM |
| v. | : | |
| | : | |
| DISTRICT OF COLUMBIA | : | |
| BOARD OF ELECTIONS, | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 65(a), Federal Rules of Civil Procedure, Plaintiffs hereby respectfully move this Honorable Court for a Preliminary Injunction, consistent with the relief sought in the Complaint in this action, [ECF #2], as more particularly described herein and for the reasons set forth below.

## INTRODUCTION

Independent and minor party candidates in the District of Columbia are required to file ballot access petitions with a set number of signatures in order to obtain access to the general election ballot in any election. *See generally*, D.C. Official Code §§1001.08; 1-123.

Independent and minor party candidates seeking ballot access in Washington, DC can only collect signatures for their ballot access signature petitions between June 12, 2020 and August 5, 2020.

https://www.dcboe.org/dcboe/media/PDFFiles/Candidate-Guide-to-Ballot-Access-2020-Rev-6_2020.pdf at Page 1.

On May 13, 2020, in recognition of the impact of the COVID-19 pandemic in a variety of essential areas, including ballot access related issues, the District of Columbia passed emergency legislation.

Among the emergency amendments enacted was legislation that dramatically lowered the ballot access signature requirements for every local and national elective office in the District of Columbia, except for the office of United States President.  *See*, § 21(a) of the Coronavirus Omnibus Emergency Amendment Act of 2020 (May 13, 2020, D.C. Act 23-317, 67 DCR 5235); §21, 67 D.C. Reg. 5235 (Ballot Access reform); *see also*,

https://www.dcboe.org/dcboe/media/PDFFiles/Candidate-Guide-to-Ballot-Access-2020-Rev-6_2 020.pdf.

Plaintiff, Gloria La Riva, is a candidate for United States President who will be appearing on the general election ballot for that office in states around the country.  She seeks access to the 2020 general election ballot in Washington, DC as an independent candidate of the office of President. [Exh. "1"]

The other Plaintiffs are Washington, DC registered voters who meet all qualifications to serve as electors, and who wish to have Ms. La Riva on the ballot for United States President in order to cast their votes for her and because of her political ideas which they support and which are not part of the political platform put forward by other Presidential candidates. [Exh. "1"]

Plaintiffs allege in this lawsuit that keeping the ballot access signature requirement for the office of United States President at 1% of all registered voters, a figure that currently requires approximately 5,007 signatures, within the very narrow window during which D.C. law permits ballot access signatures to be gathered, and under the current COVID-19 pandemic conditions, violates the Plaintiffs' First and Fourteenth (Fifth) Amendment rights. [ECF #2]

Plaintiffs further assert that lowering the signature requirement for all offices except for United States President violates the Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.[1] [ECF #2]

---

[1]  The Equal Protection Clause of the 14th Amendment applies to the District of Columbia through the 5th Amendment's Due Process Clause.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Dixon v. District of Columbia*, 666 F.3d 1337, 1339 (D.C. Cir. 2011); *Alexander v. Gov't of the Dist. of Columbia*, 2020 U.S. Dist. 115856, *37 (D.D.C., July 1, 2020).  Because ballot access cases involving Equal Protection claims arise from other States, they are analyzed in terms of the

Notwithstanding all best efforts, due to factors related to the COVID-19 pandemic Ms. La Riva cannot gain access to the ballot if the signature requirement were to remain the same as in an election year not marred by the pandemic.  If the figure were lowered to 250 signatures, the maximum amount of signatures for any other elective office on the ballot in DC in 2020, she would be able to gain access to the ballot for the office of President of the United States. [Exh. "1"]

In the underlying lawsuit, Plaintiffs seek a declaratory judgment finding the current signature requirement unconstitutional on its face and as applied to the Plaintiffs, with respect to both the absolute number of signatures required and based on the singling out of the office of United States President as the only election race for which the signature requirement was not lowered. [ECF #2]

Plaintiffs also seek preliminary and permanent injunctive relief requiring the Defendant to put Plaintiff, Gloria La Riva, on the ballot in the District of Columbia for the office of United States President in the 2020 general election, provided that Plaintiffs file a ballot access petition with 250 or more valid signatures, supporting Ms. La Riva's placement on that ballot. [ECF #2]

With the instant motion, Plaintiffs seek a preliminary injunction so providing.

### The COVID-19 Pandemic Has Had Devastating Consequences

This Court has recognized the far-reaching consequences of the current COVID-19 pandemic and has written about its impact in clear and powerful terms.

For example, in *United States v. Thomas*, 2020 U.S. Dist. LEXIS 68768, *8 (D.D.C. April 20, 2020) (Moss, J.). this Court wrote:

> The circumstances in the world have also changed. COVID-19, a highly infectious disease, is causing a once-in-a-century global pandemic, prompting the President and governors across the nation to declare states of emergency. *See United States v. Harris*, No. 19-cr-356, 2020 U.S. Dist. LEXIS 53632, 2020 WL 1503444, at *2 (D.D.C. Mar. 27, 2020). The Mayor of the District of Columbia has ordered the closure of all nonessential business, and this Court has postponed trials and other

---

14th Amendment; but the analysis and principles apply with full force here where the protection is through the 5th Amendment.

in-court proceedings in light of the pandemic. See *In Re: Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic, Standing Order No. 20-9* (Mar. 16, 2020) (BAH); *In Re: Use of Video Conferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings, Standing Order No. 20-17* (Mar. 30, 2020) (BAH)

Similarly, in *United States v. Harris*, 2020 U.S. Dist. LEXIS 53632, *3-*5 (D.D.C., March 27, 2020) (Moss, J.), this Court wrote the following:

"COVID-19 is a serious disease." ... . Although COVID-19 is "characterized by a flu-like illness," it is a far more deadly, with "5-35 times the fatality associated with influenza infections." .... COVID-19 is "highly infectious," with "each newly infected person . . . estimated to infect on average 3 additional persons"—"only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity." At the moment, there "is no known cure or anti-viral treatment for COVID-19." .... Experts have urged that the only way to mitigate the spread of the disease is for people to use preventive strategies, including "scrupulous hand hygiene and social distancing." The Center for Disease Control and Prevention recommends keeping a distance of six feet from other people to minimize the possibility of infection, washing one's hands often with soap and water, and using a hand sanitizer that contains at least 60% alcohol. How To Protect Yourself, CDC (Mar. 4, 2020), available at https://tinyurl.com/uep9p6h. Slowing the spread of the disease is "critical," 15 Days to Slow the Spread, White House (2020), available at https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf, as a rapid spread can overwhelm local health infrastructure. COVID-19 causes prolonged serious illness, which can require "significant advanced support, including ventilator assistance for respiration and intensive care support." (Citations omitted)

COVID-19 has become a "global pandemic and has been termed a global health emergency by the [World Health Organization]." On March 13, 2020, the President declared a national emergency, and, as of the date of this opinion, there have been at least 85,381 cases across the country and at least 1,271 virus-associated deaths.[2] Experts expect an explosion of new cases in the days ahead. Id. In Virginia, Maryland, and the District of Columbia, there have been 1,277 confirmed cases of COVID-19....[3]

### **The Mayor and City Council in D.C. Have Recognized COVID-19's Impact**

The Mayor and City Council have recognized the devastating effect of the COVID-19

pandemic and responsibly have responded with a number of targeted emergency measures.

---

[2] As of July 22, 2020, these numbers have increased to 3,882,167 confirmed COVID-19 positive cases and 141,677 confirmed COVID-19 related deaths. https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html

[3] As of July 21, 2020, there have been 11,529 confirmed positive COVID-19 cases and 580 COVID-19 related deaths.  https://coronavirus.dc.gov/page/coronavirus-data

Indeed, a Proposed Resolution put before the City Council months ago set out a very thorough recounting of the steps the Mayor and Council took beginning in March of 2020, based on their recognition of the far-reaching impact the pandemic was having.  Section 2(a) of the Proposed Resolution refers to the threat posed by the pandemic in many areas.  Line 145 specifically notes the need for relief in the area of ballot access.[4]

https://dccouncil.us/wp-content/uploads/2020/05/Coronavirus-Support-Act-DEC.pdf  *See also*, Lines 59-60 of an April 30, 2020 Proposed Resolution.

https://dccouncil.us/wp-content/uploads/2020/04/Coronavirus20Omnibus20Emergency20DEC.pdf

On May 6, 2020, the Council issues a release describing its important COVID-19 emergency actions and specifically noted the increased burden the pandemic placed on ballot access efforts and the Council's efforts to address these issues.

https://dccouncil.us/council-unanimously-passes-fourth-covid-response-measure/

The Council clearly recognized the severe burden the pandemic causes for ballot access related efforts and considered the same for all elective offices on the ballot except United States President.  No explanation for its exclusion can be ascertained from the Proposed Resolution that then made its way into the relevant ballot access emergency legislation.

https://dccouncil.us/wp-content/uploads/2020/04/DRAFT20Ballot20Access20Reform20Temporary20Amendment20Act20of202020.pdf.

Finally, on May 13, 2020, the emergency COVID-19 related legislation at issue in this case passed, with the ballot access related signature requirements for all elective offices on the 2020 general election ballot in DC dramatically reduced[5], except for the office of United States

---

[4]  The national media also has recognized the impact the pandemic has had and continues to have on ballot access efforts. https://abcnews.go.com/Politics/coronavirus-upends-elections-ballot-access-point-concern/story?id=70288113

[5]  The legislation dramatically reduced the signature requirements for minor party and independent candidates set forth in D.C. Official Code §1-1001.08.

President.

https://code.dccouncil.us/dc/council/acts/23-317.html; 67 D.C. Reg. 5235 (May 13, 2020).

**Courts Around the County Have Modified Ballot Access Requirements Due to the
Severe Burden Caused by the COVID-19 Pandemic.**

Courts around the country have recognized the severe burden the COVID-19 pandemic

has placed on minor party and independent candidates and their supporters in gathering

signatures for ballot access petitions and have dramatically lowered signature requirements and

taken other steps to ease the burden.  The risks noted by courts in taking such action have

included health risks, the lack of access to people, a hesitation by prospective signatories to have

in-person contact, and other factors caused by the COVID-19 pandemic.

*See e.g.*, *Libertarian Party of Illinois v. Cadigan*,  2020 WL 3421662, 2020 U.S. App.

LEXIS 20161 (7th Cir., June 21, 2020) (relaxing signature requirements due to "serious safety

concerns and substantial limitations on public gatherings;" refusing state's request for stay);

*Esshaki v. Whitmer*, 2020 WL 1910154 (E.D. Mich., Apr. 20, 2020), stay

denied in part, 2020 WL 2185553, *1 (6th Cir., May 5, 2020) (finding a severe burden from

ballot access requirements and stay-at-home orders; requirements not justified by any compelling

state interest); *Reclaim Idaho v. Little*, 2020 WL 3490216 (D. Idaho, June 26, 2020), stay denied,

No. 20-35584 (9th Cir., July 14, 2020) (loosening signature requirements for ballot initiative);

*Acosta v. Restrepo*, 2020 WL 3495777, *5 (D. R.I., June 25, 2020) (granting preliminary

injunction to allow remote signature collection based on health risks for collectors and others;

applying strict scrutiny and finding no compelling state interest); *Fair Maps Nevada v. Cegavske*,

2020 WL 2798018 (D. Nev., May 29, 2020) (enjoining state ballot initiative signature filing

deadline based on health, safety, and logistical concerns surrounding COVID-19); *Miller v.*

*Thurston*, 2020 WL 2617312, *4 (W.D. Ark., May 25, 2020), stay denied, 2020 WL 2850223

(W.D. Ark., June 2, 2020), appeal filed, No. 20-2095 (8th Cir., June 2, 2020) (enjoining in-

person and sworn affidavit ballot access signature requirements, finding they substantially restrict

6

political discussion; ordering the state to accept non-complying signatures); *People Not Politicians v. Clarno*, 2020 WL 3960440, *7 (D. Oregon, July 13, 2020) (ordering state to either place the plaintiffs on the ballot or dramatically reduce signature requirements and extend the filing deadline); *Constitution Party of Virginia v. Virginia State Board of Elections*, 2020 U.S. Dist. LEXIS 125589[6] (E.D. Va., July 15, 2020) (finding a severe burden, enjoining enforcement of required number of ballot access signatures and extending signature filing deadline); *Garbett v. Herbert*, 2020 WL 2064101 at *12 (D. Utah May 1, 2020) (severe burden).

### Political Leaders in Other States Also Have Recognized the Impact on Ballot Access

While the District of Columbia has been among the most responsible in recognizing the need to dramatically reduce ballot access signature requirements (for all offices except United States President), other states have joined with D.C. in taking appropriate action in this regard without the need for court intervention.  *See e.g.*, Connecticut Exec. Order No. 7LL, May 11, 2020 (described in *Gottlieb v. Lamont*, 2020 WL 3046205 (D. Conn., June 8, 2020); Order by Governor Inslee in Washington State suspending signature requirement due to COVID-19 dangers.

https://www.spokesman.com/stories/2020/may/06/candidates-who-are-broke-will-get-a-break-when-fil/  ; New Jersey Governor order that circulators not go door to door due to COVID-19 dangers; allowing them to collect signatures electronically.

https://nj.gov/governor/news/news/562020/approved/20200429a.shtml

### Election Law Experts Have Criticized Inaction on Ballot Access During the Pandemic

Further, election law experts have been sharply critical of any suggestion by a state that it should not give ballot access signature relief during the pandemic.  Richard Hasen, *Direct Democracy Denied: The Right to Initiative During a Pandemic*, found at 2020 University of Chicago Online:  https://lawreviewblog.uchicago.edu/2020/06/26/pandemic-initiative-hasen/.

---

[6]  The undersigned does not have access to a Westlaw citation for this case.  The undersigned subscribes to Lexis; but Westlaw citations have been ascertained whenever possible.  Standing Order §14, ¶14

The political leadership in the District of Columbia, joined by leaders in other states and by courts around the country have recognized the compelling need to dramatically relax ballot access requirements, and especially the number of signatures requirement in light of the COVID-19 pandemic.

The Mayor and City Council in DC took decisive action based on findings it rightly made on the severe burden the pandemic creates for those seeking ballot access and their supporters, with respect to the ballot access petitioning process.

The inexplicable (and unsupportable) question here is why DC dramatically relaxed the signature requirements for every elective office except one - President of the United States - the one office in which the District (or any state) has the weakest local interest in regulating and the one office on which a stringent requirement negatively impacts on a nationwide race. *See Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).

## ANALYTIC FRAMEWORK IN BALLOT ACCESS CASES

> **No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.**

*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)

> **Although the State has a legitimate -- and indeed critical -- role to play in regulating elections, it must be recognized that it is not a wholly independent or neutral arbiter. Rather, the State is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit. Recognition of that basic reality need not render suspect most electoral regulations. Where the State imposes only reasonable and genuinely neutral restrictions on associational rights, there is no threat to the integrity of the electoral process and no apparent reason for judicial intervention. As such restrictions become more severe, however, and particularly where they have discriminatory effects, there is increasing cause for  concern that those in power may be using electoral rules to erect barriers to electoral competition. In such cases, applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions.**

*Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., Concurring).

The constitutional rights at issue here, including the right to associate for political

purposes, the right to be a political candidate, the right to cast one's vote for a political candidate, and the right to the Equal Protection of the law are fundamental rights guaranteed by the First and Fourteenth (Fifth) Amendments. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 224 (1989); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986); *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983).

The Supreme Court's decision in *Clingman v. Beaver*, 544 U.S. 581 (2005) is important both for the *Anderson-Burdick* analytical framework it reaffirms and the emphasis it places on vigilantly protecting the rights of non-major party candidates. Some principles from *Clingman* are worth noting:

**First and Fourteenth Amendment Ballot Access Analysis**

The Court wrote the following in *Clingman*:

"We have held that the First Amendment, among other things, protects the right of citizens 'to band together in promoting among the electorate candidates who espouse their political views.'" *California Democratic Party v. Jones,* 530 U.S. 567, 574 (2000). Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest. *Timmons,* 520 U.S., at 358. However, when regulations impose lesser burdens, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Ibid.* (internal quotation marks omitted).

In analyzing a particular burden to First and Fourteenth Amendment rights in the ballot access context, "(the Court) should begin with the premise that there are significant associational interests at stake. From this starting point, we then ask to what extent and in what manner the State may justifiably restrict those interests. Then under the framework expressly reaffirmed in *Clingman*, 544 U.S. at 603, the Court "has sought to balance the associational interests of parties and voters against the States' regulatory interests through the flexible standard of review reaffirmed by the Court...." Under that standard, "the rigorousness of our inquiry into the

propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi,* 504 U.S. 428, 434 (1992). Regulations imposing severe burdens on associational rights must be narrowly tailored to advance a compelling government interest. *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358  (1997). Regulations imposing lesser burdens are subject to less intensive scrutiny, and reasonable, nondiscriminatory restrictions ordinarily will be sustained if they serve important regulatory interests. *Id.*

This regime reflects the limited but important role of courts in reviewing electoral regulation.

The Court also wrote:

Although the State has a legitimate—and indeed critical—role to play in regulating elections, it must be recognized that it is not a wholly independent or neutral arbiter. Rather, the State is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit. Recognition of that basic reality need not render suspect most electoral regulations.

Where the State imposes only reasonable and genuinely neutral restrictions on associational rights, there is no threat to the integrity of the electoral process and no apparent reason for judicial intervention. As such restrictions become more severe, however, and particularly where they have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition. In such cases, applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions.

*Clingman*, 544 U.S. at 603 (O'Connor, concurring)

**Candidates' and Voters' Fundamental Rights are at Issue**

In *Anderson v. Celebrezze,* 460 U.S. 780 (1983), the Court considered the impact of early filing dates on small political parties and independent candidates. Commenting on election laws that disadvantage independents, it noted:

By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas. Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream. In short, the primary values protected by the First Amendment—'a profound national commitment to

10

> the principle that debate on public issues should be uninhibited, robust, and wide-open,'—are served when election campaigns are not monopolized by the existing political parties.

*Clingman*, 544 U.S. at 620-21, *quoting from Anderson, Id.,* at 794 (citations omitted).

Accordingly, "[r]estrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively, and may not survive scrutiny under the First and Fourteenth Amendments." *Munro v. Socialist Workers Party,* 479 U.S. 189 (1986), *citing Williams v. Rhodes,* 393 U.S. 23, 30 (1968).

It is true, of course, that "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." *Id.* Thus, courts must engage in a balancing test to weigh the rights of States to condition access to the general election ballot against the rights of citizens to form political parties that can vie for election, the right to associate with the independent candidate of choice, and the rights of citizens to cast votes effectively for their chosen candidate.

The Court's "primary concern is with the tendency of ballot access restrictions 'to limit the field of candidates from which voters might choose.' Therefore, '[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters'" *Anderson,* 460 U.S. at 786. (Internal citation omitted.) Where "the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest and is narrowly tailored to serve that interest." *Eu v. San Francisco County Democratic Cent. Committee,* 489 U.S. 214, 222, 109 S. Ct. 1013 (1989). (Internal citation omitted.) *See also*, *Clingman*, 544 U.S. at 596-87 ("Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) ( a severe restriction on a party's access to the ballot must be "narrowly tailored to serve a compelling state interest.").

**The Burden Here is Severe**

In the instant case, the burden is severe.  Strict scrutiny applies and so, in addition to demonstrating an articulated compelling interest to justify the regulation, states must "adopt the least drastic means to achieve their ends."  *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 185 (1979).

The District of Columbia recognized the severe burden the COVID-19 pandemic poses for petitioning candidates seeking access to the ballot and for their supporters, including circulators.  It dramatically lowered the signature requirements for all races but the Presidential race; but it kept the narrow time frame for collecting signatures, from June 12, 2020 to August 5, 2020 intact.  That narrow time frame is a significant factor in considering the overall burden imposed.[7]  *See Nader v. Keith*, 385 F.3d 729, 731 (7th Cir. 2004) ("Restrictions on candidacy must . . .be considered together rather than separately."); *See also Williams*, 393 U.S. at 34 (ballot access laws should be viewed in their totality, not in isolation); *Pilcher v. Rains*, 853 F.2d 334, 336 (5th Cir. 1988) (facially valid provisions may operate in tandem to produce impermissible barriers to ballot access - for example, if a state had a 1% signature requirement, but imposed a single other unreasonable barrier, that would still effectively deny ballot access and would be unconstitutional, *citing Storer* and *Anderson*).[8] [See Exh. "2" at ¶¶13-14]

 "[W]hat is demanded (by the State) may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot.  The Constitution requires that access to the electorate be real, not 'merely

---

[7]  *Compare, e.g., Swanson v. Worley*, 490 F.3d 894, 904 (11th Cir. 2007) (upholding signature requirement based on the "alleviating factor" that a candidate has an "unlimited" time frame to collect signatures).

[8]  A Court must examine the *cumulative* burdens imposed by the *overall* scheme of electoral regulations upon the rights of voters and parties to associate .... "A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition. Even if each part of a regulatory regime might be upheld if challenged separately, one or another of these parts might have to fall if the overall scheme unreasonably curtails associational freedoms."  *Clingman*, 544 U.S. at 607-08.

theoretical.'" *Am. Party of Texas v. White,* 415, U.S. 767, 783 (1974).

Ballot access requirements that raise the bar so high as to virtually prevent independent candidates from appearing should not survive strict scrutiny analysis.   Williams, 393 U.S. at 31-32.

**Equal Protection Analysis**

Similarly, Equal Protection jurisprudence requires great vigilance in considering ballot access related statutes which discriminate against minor parties or independent candidates and those who would vote for them.  Such jurisprudence clearly requires striking down statutes which discriminate against minor parties or independents, even when the discrimination falls short of functionally excluding such candidates from the ballot.  *See e.g.*, *Green Party of Tennessee v. Hargett*, 791 F.3d 684 (6th Cir. 2015) (reaffirming the centrality of Equal Protection analysis in considering the constitutionality of ballot access laws which treat minor parties differently from major parties - and emphasizing the importance of fact-finding and fact-specific analysis); *Green Party v. Aichele*, – F.Supp. 3d –, 2015 WL 871150, *22 (E.D. Pa., March 2, 2015) (Ballot access restrictions must not discriminate against minor parties); *Lux v. Judd*, 651 F.3d 396 (4th Cir. 2011) (reversing Rule 12(b)(6) dismissal and remanding for fact-finding and opportunity for additional arguments, notwithstanding considerable leeway afforded in regulating ballots); *Lux v. Judd*, 842 F.Supp.2d 895 (E.D. Va. 2012) (on remand, minor party prevails on First Amendment grounds); *Libertarian Party of Virginia v. Judd*, 881 F.Supp.2d 719 (E.D. Va. 2012); *Delaney v. Bartlett*, 370 F. Supp. 2d 373 (M.D. N.C. 2004) (Equal Protection prohibits discrimination against minor parties or independents and between minor parties and independents).

In the context of the COVID-19 pandemic, as the D.C. government recognized for all other elective offices in 2020, the pandemic makes the regular signature requirement excessive. The same factors fully apply to efforts to gain access to the ballot for the Presidential race.  The 1% signature requirement here raises the bar so high that it absolutely prevents independent candidates like Ms. La Riva from appearing altogether and it cannot survive any level of scrutiny.

13

*Anderson-Burdick* **Applied**

In *Anderson-Burdick* terms, the 1% signature requirement for an independent candidate to gain ballot access under the current COVID-19 pandemic conditions - indeed any signature requirement over the 250 signatures requirement for access to the 2020 general election ballot for an independent candidate for any other local or national elective office in DC - constitutes a severe burden, than can only be justified, if at all, by a compelling state interest, addressed through the least restrictive means.

It is impossible to know what interests the District of Columbia might claim support this severe burden[9]; but there is no legitimate interest of sufficient strength or supported by sufficient evidence to prove its legitimacy to permit this severe burden to stand.  Indeed, especially in light of the District's findings that led to the May 13th emergency legislation and the ballot access reform as to every other elective office, there is not even a justifiable, legitimate rational interest that would permit the 1% signature requirement to stand.

The 1% signature requirement violates the Plaintiffs' First Amendment rights.  The failure to reduce it for the Presidential race, while reducing it for every other elective office, with violates the Plaintiffs' Fifth Amendment rights to the Equal Protection of the law as well.

**Legal Framework for the Consideration of a Preliminary Injunction Motion**

This Court has clearly and succinctly explained the legal principles at play in a court's consideration of a motion for a preliminary injunction in this District as follows:

> Preliminary injunctive relief is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Banks v. Booth*, No. 20-849, 2020 U.S. Dist. LEXIS 68287, at *15 (D.D.C. Apr. 19, 2020) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392, 396 U.S. App. D.C. 1, (D.C. Cir. 2011)). To obtain a preliminary injunction, a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor,

---

[9]  The undersigned contacted opposing counsel in advance of this filing to see whether counsel were aware of the interests the District of Columbia intends to claim support the continued imposition of the 1% signature requirement after dramatically lowering the signature requirement for all other races; but counsel had not yet been informed of those interests.  Therefore Plaintiffs cannot yet fully address the *Anderson-Burdick* framework by addressing any claimed interests..

and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038, 408 U.S. App. D.C. 291 (D.C. Cir. 2014). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197, 410 U.S. App. D.C. 80 (D.C. Cir. 2014) (quoting <u>Davis v. Pension Benefit Guar. Corp.</u>, 571 F.3d 1288, 1292, 387 U.S. App. D.C. 205 (D.C. Cir. 2009)) (internal quotation marks omitted). Before the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008), courts in this circuit applied a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392, 396 U.S. App. D.C. 1 (D.C. Cir. 2011). Since *Winter*, the D.C. Circuit has hinted on several occasions that "a likelihood of success is an independent, free-standing requirement," id. at 393 (quotation omitted), but it "has not yet needed to decide th[e] issue," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7, 426 U.S. App. D.C. 67 (D.C. Cir. 2016). "In light of this ambiguity, the Court shall consider each of the [four] factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome." *Banks*, 2020 U.S. Dist. LEXIS 68287, at *7.

*Costa v. Bazron*, 2020 U.S. Dist. LEXIS 91043, *8-*9 (D.D.C., May 24, 2020) (Moss, J.).

### Plaintiffs Satisfy All Requirements for the Requested Preliminary Injunction

**A.    Plaintiffs are Likely to Succeed on the Merits**:

On May 13, 2020, the D.C. government passed emergency legislation to address the devastating impact the COVID-19 virus has had and is having in a number of fundamental areas of government operations and daily life.

Section 21 of the legislation recognizes the impact the severe burden the pandemic has on the ability of independent and minor party candidates to obtain ballot access signatures.  In direct recognition of the conclusions reached in that regard, the D.C. government dramatically reduced the number of signatures required to obtain ballot access for every single elective office on the D.C. general election ballot for 2020 except for one elective office - the office of President of the United States. https://code.dccouncil.us/dc/council/acts/23-317.html; 67 D.C. Reg. 5235 (May 13, 2020).

Here is the specific relevant action taken in the May 13, 2020 emergency legislation:

A.    **Delegate to the U.S. House of Representatives** – Reduced signatures from 1.5% of all registered voters or 3,000, whichever is less, to **250 signatures.** [D.C. Official Code § 1-1001.08(j)(4)(A)].

15

B. **At-large Member of the Council** - Reduced signatures from 1.5% of all registered voters or 3,000, whichever is less, to **250 signatures**. [D.C. Official Code § 1-1001.08(j)(4)(A)].[10]

C. **U.S. Senator** - Reduced signatures from 1.5% of all registered voters or 3,000, whichever is less, to **250 signatures**. [D.C. Official Code §§ 1-123(d)(2), 1-1001.08(j)(4)(A)].

D. **U.S. Representative** - Reduced signatures from 1.5% of all registered voters or 3,000, whichever is less, to **250 signatures**. [D.C. Official Code §§ 1-123(d)(2), 1-1001.08(j)(1)(B)].

E. Other local elective offices have had signature requirements adjusted to even lower levels due to the COVID-19 pandemic. https://dcboe.org/dcboe/media/PDFFiles/Updated-110320-GE-Election-Calendar-051220.pdf.

All District of Columbia-wide elective offices and all national elective offices, except for the office of President of the United States, had their ballot access signature requirements lowered through the May 13, 2020 emergency legislation such that the highest number of signatures required for access to the ballot for any such office, including for U.S. Senate or U.S. House, is 250 signatures.

However, to gain ballot access for the office of President of the United States, an independent or minor party candidate still has to obtain the same number of signatures as in every other election year - 1% of the number of qualified registered D.C. voters, at least 5067 signatures - and, as recommended by the DCBOE staff, an independent or minor party candidate really would need to obtain 10,034 signatures to be safe. D.C. Official Code §1-1001.08(f).

---

[10]  This is the statutory citation that appears in the official documents published by the D.C. government: https://dcboe.org/dcboe/media/PDFFiles/Updated-110320-GE-Election-Calendar-051220.pdf.

However, an examination of the statute on LEXIS indicates that there is no such statutory section as §1-1001.08(j)(4)(A).

All of the same COVID-19 risks and problems that led the D.C. government

to responsibly and appropriately lower the ballot access signature requirements for all other

elective offices in D.C. apply to at least the same degree for the office of President of the United

States.

There is no constitutionally justifiable basis for imposing this extraordinarily more

burdensome signature requirement on a Presidential candidate.  It is most curious that DC would

choose to place a more severe burden on ballot access for the Presidential race rather than on a

local or other District-wide race of particular state interest.

For good reason, it is rare for a state to try to impose more burdensome ballot access

requirements on an independent or minor party candidate for President than on such a candidate

for any other office.  Where such a differential in that direction has been imposed by a State, it

has been struck down on Equal Protection grounds, even under a rational basis test.  *See Daien v.*

*Ysura*, 711 F. Supp. 2d 1215, 1235-1238 (D. Idaho 2010).

As the United States Supreme Court has written, "... [I]n the context of a Presidential

election, state-imposed restrictions implicate a uniquely important national interest. For the

President and the Vice President of the United States are the only elected officials who represent

all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the

votes cast for the various candidates in other States. Thus in a Presidential election a State's

enforcement of more stringent ballot access requirements, ... has an impact beyond its own

borders. Similarly, the State has a less important interest in regulating Presidential elections than

statewide or local elections, because the outcome of the former will be largely determined by

voters beyond the State's boundaries."  *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983).[11]

As recognized by the May 13, 2020 emergency legislation, the COVID-19

---

[11]  As one court put it recently, in acknowledging that *Anderson* expressly held that a State has a
less important interest in regulating Presidential elections than in other elections, *Anderson*
applies to all elections, "but with a thumb on the scale in favor of ballot access when the
candidates challenging the requirements are presidential candidates.  *Cowen v. Ga. Sec'y of State*,
2020 U.S. App. LEXIS 17427, *13 (11th Cir., June 3, 2020).

pandemic creates all sorts of overwhelming barriers to gathering ballot access signatures.  Those barriers with respect to the signature requirement for independent and minor party candidates for the 2020 Presidential race absolutely violate the Plaintiffs' First and Fourteenth (Fifth) Amendment rights.

Applying the *Anderson-Burdick* test to the instant situation leads clearly to the conclusion that Plaintiffs are likely to succeed on the merits.[12]

The 1% signature requirement, with all signatures permitted to be gathered only between June 12, 2020 and August 5, 2020, constitutes a severe and, indeed, impossible burden on the First and Fourteenth Amendment rights of the Plaintiffs.  The signature requirement is not and cannot be justified by any legitimate state (D.C.) interest.

The 1% signature requirement for Presidential ballot access in DC imposes a significant burden even in normal times.  In fact, in practical terms, it is one of the two most onerous signature requirements for an independent candidate seeking access to a Presidential ballot in the country and the other state has a longer petitioning period.  Significantly, DC also has one of the two shortest petitioning periods in the nation for an independent candidate for President [Exh. "2 at ¶¶13-14].[13]  But these are not normal times and the burden is exponentially increased now in light of the COVID-19 pandemic.

The clearest evidence that the ballot access signature requirements in DC impose a severe burden on the Plaintiffs' First and Fourteenth (Fifth) Amendment rights comes from the State (DC) itself, as reflected in the reasons it has provided for passing the various iterations of emergency legislation as a function of the COVID-19 pandemic, and specifically Section 21 of

---

[12]  This Circuit, like every other, of course, instructs that the *Anderson-Burdick* framework is to be applied for analyzing ballot access restrictions.  *See e.g., Libertarian Party v. D.C. Board of Elections & Ethics*, 682 F.3d 72 (D.C. Cir. 2012).

[13]  Attached hereto as Exhbit "2" is a Declaration from Richard Winger, the nation's leading ballot access expert, deemed qualified as an expert on ballot access by courts throughout the country.  His C.V. is attached as well and reflects those courts in which he has testified as an expert on ballot access.

the May 13th emergency legislation dramatically lowering the ballot access signature requirements for all other races.  DC recognized the severity of the burden imposed and acted accordingly for all other races.  The burden applies with the same force to the Presidential race.

Additionally, in each of the cases cited above from other jurisdictions in which courts lowered ballot access requirements, the courts found the circumstances arising from the COVID-19 pandemic to constitute a severe burden vis a vis ballot access requirements.  *See e.g., Esshaki v. Whitmer*, 2020 WL 1910154 (E.D. Mich., April 20, 2020), *affirmed in relevant part, Esshaki v. Whitmer*, 2020 U.S. App. LEXIS 14376 (6th Cir., May 5, 2020) (strict scrutiny applies to severe burden imposed by ballot access requirements in light of COVID-19, requiring narrowly ballot access provisions to effectuate a compelling state interest); *See also, Esshaki v. Whitmer*, 2020 U.S. Dist. LEXIS 88536 (E.D. Mich., May 20, 2020) (same).

The severe burden imposed by the pandemic requires strict scrutiny review of the signature requirement, both as to the absolute number required within the time frame provided and as to the baseless disparity between the number required for the office of President of the United States and all other elective office on the ballot in 2020 in D.C.

Only ballot access provisions that are narrowly tailored to effectuate a compelling state interest would satisfy the strict scrutiny required here.  Maintaining the 1% signature requirement applied in non-pandemic times cannot be justified by any legitimate, evidence-supported state interest under Anderson-Budick analysis.  *See Norman v. Reed*, 502 U.S. 279 (1992) (Applying strict scrutiny to State's purported interests and requiring least restrictive means to advance any legitimate interests)*; Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005).

Plaintiffs have taken all necessary steps to timely organize a ballot access signature campaign to get Ms. La Riva on the D.C. ballot for the office of United States President and believe they can obtain the ballot access signatures of 250 qualified registered voters before August 5, 2020 and otherwise qualify for placement on the 2020 D.C. general election ballot for that office; however, it would be impossible under the current COVID-19 pandemic conditions to

obtain 5,067 qualifying signatures.  Plaintiffs recognized that as a futile endeavor. [Exh. "1"]

There is no publicly available explanation (that the undersigned has been able to locate) provided for distinguishing between this one elective office and all others or for not alleviating this severe burden with respect to that one race, while alleviating it for every other elective office. It is impossible, therefore, to know what state interests the Defendant might claim support the continued imposition of the 1% signature requirement during the pandemic and in contrast to the dramatically lowered signature requirement for every other elective office.  A compelling interest and the least restrictive means to effectuate such a compelling interest must be required; but here, there is not even any rational reason that could support imposing this burden and distinguishing the Presidential race from all others.

The United States Supreme Court expressly has written that the quantum of support necessary to ensure an orderly ballot for one office ought to be sufficient for the other.  *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979).

If the Defendant comes forward with interests it claims justifies the burden imposed, it will, of course, need to demonstrate the strength and legitimacy of any such claimed interests and explain how the continued imposition of the 1% signature requirement, in a narrow time frame, in the middle of the pandemic is the least restrictive means for effectuating any such claimed compelling state interest.  *See e.g., Green Party of Ga. v. Georgia*, 551 Fed. Appx. 982 (11th Cir. 2014) (State's claimed interests must be supported by evidence showing their applicability to the specific ballot access restriction at issue); *Bergland v. Harris*, 767 F.2d 1551 (11th Cir. 1985); *Lux v. Judd*, 651 F.3d 396, 404 (4th Cir. 2011); *Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring).  There can be no sufficient state interests.

Plaintiffs are likely to succeed on the merits.

**B.  Plaintiffs Will Suffer Irreparable Harm**

Wrongfully denying an otherwise qualified candidate an opportunity to appear on the ballot and denying citizens who would have voted for him that opportunity constitutes irreparable

harm. *Jones v. McGuffage*, 921 F. Supp. 2d 888, 901 (N.D. Ill. 2013); *Swanson v. Bennett*, 219 F. Supp. 2d 1225, 1233-34 (M.D. Ala. 2002) (Same and noting no adequate remedy at law for such a deprivation).

It is patently clear that the denial of a place on the ballot in an election that is imminent constitutes irreparable harm to the candidate, his party and his prospective voters.  The moment of opportunity to campaign for and win election to public office is transitory and cannot be recreated at a later date.  Indeed, "even the temporary deprivation of First Amendment rights constitutes irreparable harm in an injunction suit." *Johnson v. Cook County Officers Electoral Bd.,* 680 F. Supp. 1229, 1232 (N.D. Ill. 1988), *citing Citizens for a Better Environment v. City of Park Ridge,* 567 F.2d 689, 691 (7th Cir. 1975). *Accord, Marion County Committee of Indiana Democratic Party v. Marion County Election Bd.,* 2000 WL 1206740 *11 (S.D. Ind. Aug. 3, 2000)(Unpublished) ("Exclusion of an otherwise-qualified candidate from the ballot would amount to irreparable harm to plaintiff, its candidate, and its members.")

**C.  A Balancing of the Equities Favors the Plaintiffs.**

The balancing of the equities in this case clearly favors granting the requested injunctive relief.  If the injunction is not granted, Plaintiffs will suffer the irreparable harm described above. Ms. La Riva will be kept off the ballot and her supporters and voters and those who wish to have her political points of view represented on the ballot will lose any and all opportunity for the same in the 2020 election.  That harm extends past just DC, since this is for a Presidential election.  In contrast, the Defendant and the District of Columbia will suffer no harm if the injunction is issued and, indeed, will benefit from the inclusion of Ms. La Riva and her point of view on the ballot, as DC voters and supporters will be well served.

**D.  The Injunction is in the Public Interest.**

The public interest in this case is clear. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (*quoting Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir.

2012)), *aff'd* 134 S. Ct. 2751 (2014).

The requested injunction will also ensure that DC citizens have a greater opportunity to vote for candidates of their choice.  Without an injunction, voter choices will be limited. In some instances, voters may have no choice at all. The public undoubtedly has a vital interest in a broad selection of candidates as well as the conduct of free, fair, and constitutional elections. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (recognizing the public has a "strong interest in exercising the fundamental political right to vote" (citations omitted)).

> The First Amendment, which constrains state-government action by incorporation through the Fourteenth Amendment, "protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997). That right "means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968). Further, because "voters can assert their preferences only through candidates or parties," their right to vote "is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (internal quotation marks omitted).

> Laws restricting a party's ballot access thus burden two rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." *Williams*, 393 U.S. at 30.

*Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 523-524 (7th Cir. 2017).

The requested injunction, if granted, would therefore favor the public interest.

## CONCLUSION AND REQUESTED REMEDY

For all of the foregoing reasons, the Defendant must be enjoined from enforcing the 1% signature requirement for an independent candidate to gain ballot access to the 2020 general ballot in DC for the office of President of the United States.  *See* D.C. Official Code §1-1001.08(f).  It might be that equity will require the Defendant to be enjoined from enforcing the August 5, 2020 deadline for the submission of ballot access petitions for independent candidates for the office of President, depending on when this matter is resolved; but if it is resolved speedily, that should not be necessary.

Plaintiffs respectfully ask the Court to declare the 1% signature requirement as applied to

independent candidates seeking access to the 2020 general election ballot for the office of President in DC to violate Plaintiffs First and Fourteenth (Fifth) Amendment rights.

It is, by now, axiomatic that, "wherever practical," a federal court should give elected officials an opportunity to remedy an unlawful election law, *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978), and that would be appropriate here. *Esskahi v. Whitmer*, 2020 WL 2185553, *2 (6th Cir., May 5, 2020) (affirming district court finding that ballot access requirements posed an unconstitutional severe burden in light of COVID-19; but staying district court's direction to State as to how to remedy the unconstitutional requirement); *Clingaman v. Beaver*, 544 U.S. 581, 586 (2005).

Accordingly, after declaring the statute unconstitutional as applied and enjoining its enforcement, Plaintiffs respectfully ask the Court to instruct the District of Columbia to reduce the ballot access burden imposed and to draw any such restriction as narrowly as possible to align with its interests, while allowing the Plaintiffs to enjoy the fundamental constitutional rights at issue here.

Plaintiffs respectfully submit that any signature requirement in excess of 250 signatures, given DC's action with respect to all other elective offices on the 2020 general election ballot, would be unconstitutionally burdensome as applied to the Plaintiffs.

Respectfully Submitted.

_____
/s/ David I. Schoen
Counsel for Plaintiffs
(D.C. Bar No. 391408)

## **CERTIFICATE OF SERVICE**

I hereby certify that I have caused a true and correct copy of the foregoing to be served on all counsel of record by filing the same through this Court's ECF system and by email the same to opposing counsel on this 24th day of July, 2020.

_____
/s/ David I. Schoen
Counsel for Plaintiffs
(D.C. Bar No. 391408)

David I. Schoen
Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone:  334-395-6611
Facsimile: 917-591-7586
E-Mail: Dschoen593@aol.com
          Schoenlawfirm@gmail.com

24